```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3      UNITED STATES OF AMERICA,

 4          vs.
                                    Criminal No. 22-225
 5      SETH HOLLERICH,

 6              Defendant.
                                - - -
 7

 8    Transcript of Detention Hearing on September 14, 2022, in the
      United States District Court, Pittsburgh, Pennsylvania, before
 9    The Honorable Patricia L. Dodge, Magistrate Judge.

10

11    APPEARANCES:

12    For the Government:        Karen Gal-Or, Esquire
                                 U.S. Attorney's Office
13                               U.S. Courthouse
                                 700 Grant Street, Suite 4000
14                               Pittsburgh, Pennsylvania 15219

15

16    For the Defendant:        Johanathan D. Brooks, Esquire
                                 Office of the Federal Public
17                               Defender1500 Liberty Center
                                 1001 Liberty Avenue
18                               Pittsburgh, Pennsylvania 15222

19    Court Reporter:           Sharon Siatkowski, RMR, CRR, CBC, CRI
                                 700 Grant Street, Ste. 5300
20                               Pittsburgh, Pennsylvania 15219

21

22

23    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription
24

25
```

```
1                        I N D E X

2    WITNESS                                        PAGE

3    For the Government:

4    Martin Ryan

5         Direct Examination by Ms. Gal-Or          11

6         Cross-Examination by Mr. Brooks           27

7

8    Leah Masciantonio

9         Direct Examination by Ms. Gal-Or          29

10        Cross-Examination by Mr. Brooks           34

11

12   For the Defense:

13   Tiffany Lovejoy

14        Direct Examination by Mr. Brooks          37

15        Cross-Examination by Ms. Gal-Or           41

16        Redirect Examination by Mr. Brooks        46

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2            (In open court, Defendant present with counsel.)

 3                          - - -

 4            THE COURT:  Good morning.  We are here this morning in

 5    the matter of the United States vs. Seth Hollerich at Docket

 6    Number 22-225.

 7            Would counsel identify themselves, please?

 8            MS. GAL-OR:  Good morning.  Karen Gal-Or on behalf of

 9    the United States.

10            THE COURT:  Good morning.

11            MR. BROOKS:  Good morning.  Johanathan Brooks on

12    behalf of Mr. Hollerich.

13            THE COURT:  Good morning.  The first order of business

14    today is the arraignment.

15            Mr. Hollerich, the purpose of this proceeding is to

16    advise you of the nature of the charges against you and to take

17    your plea.

18            Mr. Brooks, has Mr. Hollerich received a copy of the

19    indictment?

20            MR. BROOKS:  He has.

21            THE COURT:  Have you had an opportunity to review it

22    with him?

23            MR. BROOKS:  I have.

24            THE COURT:  Do you waive the formal reading?

25            MR. BROOKS:  I do.
```

1          THE COURT:  All right.  Then, Mr. Hollerich, I'm going

2  to briefly review with you that a federal grand jury returned a

3  three-count indictment against you for the following alleged

4  violations of federal law:

5          In Count One, you have been charged with distribution

6  of material depicting the sexual exploitation of a minor on or

7  about March 18th of 2021.  That would be a violation of Title 18

8  of the United States Code, Section 2252(a)(2).

9          In Count Two of the indictment, you have been charged

10  with distribution of material depicting the sexual exploitation

11  of a minor on or about September 30, 2021.  That would also be a

12  violation of the same section of the United States Code.

13          In Count Three, you have been charged with possession

14  of material depicting the sexual exploitation of a minor on or

15  about November 10th of 2021.  That would be a violation of

16  Title 18 of the United States Code, Sections 2252(a)(4)(B) and

17  2252(b)(2).

18          Ms. Gal-Or, would you advise Mr. Hollerich of the

19  maximum penalties for those counts?

20          MS. GAL-OR:  Yes, Your Honor.

21          THE COURT:  Thank you.

22          MS. GAL-OR:  As to Counts One and Two, the maximum

23  penalties are imprisonment of not less than five years and not

24  more than 20 years, but if the defendant has a prior conviction

25  under Title 18, United States Code, Chapter 110, Chapter 71,

1    Chapter 109A, Chapter 117, Section 1591, or under Section 920 of

2    Title 10, or under the laws of any state relating to aggravated

3    sexual abuse, sexual abuse, or abuse of sexual conduct involving

4    a minor or ward, or the production, possession, receipt,

5    mailing, sale, distribution, shipment, or transportation of

6    child pornography, or sex trafficking of children, the defendant

7    shall be fined under this title and imprisoned not less than 15

8    years nor more than 40 years.

9           In addition, a fine of $250,000.

10          And a term of supervised release of at least five

11   years and up to life.

12          In addition, there are several mandatory special

13   assessments.  First, a mandatory special assessment of $100 must

14   be imposed at each count upon which the defendant is convicted.

15          In addition, as to Counts One, Two, and Three, an

16   additional special assessment of $5,000 must be imposed, as the

17   offenses were committed after May 29, 2015, and the offenses are

18   located within Chapter 110 of Title 18, United States Code.

19          Pursuant to Section 2259A of that same statute, an

20   additional special assessment of not more than $35,000 shall be

21   assessed as to Counts One and Two.

22          With regard to Count Three, possession of material

23   depicting the sexual employment of a minor, the maximum

24   penalties are a term of imprisonment of not more than ten years.

25          Any image of child pornography involved in the offense

```
1   involved a prepubescent minor or a minor who had not attained 12
2   years of age, the defendant shall be fined and imprisoned not
3   more than 20 years, or;
4            If the defendant has a prior conviction under
5   Title 18, United States Code, Chapter 110, Chapter 71,
6   Chapter 109A, Chapter 117, or under Section 920 of Title 10, or
7   under the laws of any state relating to aggravated sexual abuse,
8   sexual abuse, or abuse of sexual conduct involving a minor or
9   ward, or the production, possession, receipt, mailing, sale,
10  distribution, shipment, or transportation of child pornography,
11  such person shall be fined under the title and imprisoned not
12  less than 10 years and not more than 20 years.
13           In addition, a fine of not more than $250,000 may be
14  imposed.
15           And a term of supervised release of at least five
16  years up to life.
17           And with regard to Count Three, pursuant to Title 18,
18  United States Code, Section 2259A, an additional special
19  assessment of not more than $17,000 shall be assessed as the
20  offense was committed after December 7, 2018, and the offense is
21  for trafficking in child pornography as defined in Title 18,
22  United States Code, Section 2259(c)(3).
23           In addition, restitution may be required as to all of
24  the counts charged.
25           And the amount of restitution to each victim shall not
```

1  be less than $3,000.

2          THE COURT:  Thank you, Ms. Gal-Or.

3          Mr. Hollerich, do you understand what the charges are

4  against you?

5          THE DEFENDANT:  I do, Your Honor.

6          THE COURT:  Do you understand the maximum penalties

7  for those charges?

8          THE DEFENDANT:  I do, Your Honor.

9          THE COURT:  Thank you.

10          Mr. Brooks, how does Mr. Hollerich plead?

11          MR. BROOKS:  Not guilty.

12          THE COURT:  Does he wish to retain his right to a jury

13  trial?

14          MR. BROOKS:  He does.

15          THE COURT:  At some point during our proceeding,

16  Ms. Eckenrode will provide you with the arraignment plea.  It

17  looks like you have the arraignment plea.  I would ask you and

18  Mr. Hollerich sign that at some point before we're concluded

19  today.

20          All right.  What is the status of discovery at this

21  point, Ms. Gal-Or?

22          MS. GAL-OR:  Your Honor, there has been initial and

23  supplement production of discovery which should at this time

24  complete the discovery of the non-obscene matters.

25          I also believe that Johanathan Brooks was able to see

| | |
|---|---|
| 1 | all of the Rule 16 material at Homeland Security with one of the |
| 2 | agents there and was able to review the material. |
| 3 | THE COURT:  All right.  Thank you. |
| 4 | Do you have an estimate of how much time the |
| 5 | government will need at trial? |
| 6 | MS. GAL-OR:  Two days, Your Honor. |
| 7 | THE COURT:  Mr. Brooks, how much additional time for |
| 8 | Mr. Hollerich? |
| 9 | MR. BROOKS:  One day, Your Honor. |
| 10 | THE COURT:  All right.  Mr. Brooks, do you wish to |
| 11 | make any oral motions at this time? |
| 12 | MR. BROOKS:  Yes.  I would ask that the Pretrial |
| 13 | motions schedule be extended by 45 days. |
| 14 | THE COURT:  All right.  That motion is granted.  That |
| 15 | extends the time for Pretrial motions through October 31st of |
| 16 | this year. |
| 17 | I want to also now turn to other matters.  But first, |
| 18 | let me issue an order confirming that the United States has an |
| 19 | obligation to timely disclose Brady information to |
| 20 | Mr. Hollerich. |
| 21 | I remind government counsel that failure to comply |
| 22 | with these disclosure obligations may result in consequences |
| 23 | such as:  the exclusion of evidence, dismissal of charges, |
| 24 | contempt proceedings, disciplinary referral, and any other |
| 25 | relief authorized by law.  And I'll also issue a written order |

 1    to that effect.

 2            Ms. Gal-Or, is the government seeking detention in

 3    connection with the indictment?

 4            MS. GAL-OR:  Yes, Your Honor.

 5            THE COURT:  All right.  And is the government entitled

 6    to seek detention because there are new or additional charges in

 7    the indictment as opposed to the complaint for which we already

 8    have a process?

 9            MS. GAL-OR:  Yes, Your Honor.  The complaint charged

10    Mr. Hollerich with possession of child sexual exploitation

11    material.  The indictment has added two charges of distribution.

12            THE COURT:  Mr. Brooks, do you agree?

13            MR. BROOKS:  Yes, Your Honor.

14            THE COURT:  All right.  I believe we were scheduled

15    today for both a bond hearing and a detention hearing.  It's my

16    understanding from a brief meeting with counsel before this

17    proceeding that we are not proceeding with a bond hearing; is

18    that correct?

19            MS. GAL-OR:  Your Honor, that is correct.  I do

20    understand that there is a pending motion to amend the bond

21    conditions which I believe will -- I believe the defendant has

22    not withdrawn.  So it's my understanding that that will also

23    take place today.

24            THE COURT:  Understood.  Understood.  Mr. Brooks, do

25    you agree with that?

1          MR. BROOKS:  I agree.

2          THE COURT:  I think, probably in the order of things,

3     we'll deal with the detention hearing.  Mr. Brooks, I will also

4     deal with your motion depending on outcome of that detention

5     hearing, all right?

6          MR. BROOKS:  Thank you.

7          THE COURT:  Then we are ready to proceed with a

8     detention hearing, noting that this matter comes to the Court

9     based on the government's request to detain Mr. Hollerich

10    pending the trial.

11          I want to note for the record that in considering that

12    request I'm guided by several general principles.

13          First of all, at all times Mr. Hollerich is entitled

14    to the presumption of innocence.  Nothing that takes place in

15    this hearing and nothing I set forth in my findings is intended

16    to effect that presumption nor should it be construed to do so.

17    Rather, the purpose of this detention hearing is to determine

18    whether notwithstanding that presumption of innocence

19    Mr. Hollerich should be detained pending trial.

20          As counsel is aware, I am also guided by the Bail

21    Reform Act that requires me to consider whether there are any

22    conditions or combination of conditions that will assure the

23    appearance of Mr. Hollerich and/or the safety of persons in the

24    community.  I'm required by the Bail Reform Act to consider

25    certain factors with respect to that issue and determine whether

1    there are any such conditions.

2            If there are, I may release Mr. Hollerich on those

3    conditions.  If there are not, then I am required to order him

4    detain pending the trial of this matter.

5            With that, Ms. Gal-Or, are you prepared to proceed?

6            MS. GAL-OR:  I am, Your Honor.

7            THE COURT:  All right.

8            MS. GAL-OR:  The government would call Special Agent

9    Martin Ryan.

10            THE COURT:  All right.  Please step forward to be

11    sworn.

12            (Administration of the oath.)

13            THE CLERK:  Please take the witness stand.  State and

14    spell your name for the court reporter.

15            THE WITNESS:  Martin Ryan, R-Y-A-N.

16            THE COURT:  Ms. Gal-Or, you may proceed when ready.

17            MARTIN RYAN, a witness herein, having been first duly

18    sworn, was examined and testified as follows:

19                        DIRECT EXAMINATION

20    BY MS. GAL-OR:

21        Q.   Good morning, Agent Ryan.

22        A.   Good morning.

23        Q.   Agent Ryan, where are you currently employed?

24        A.   As a special agent with Homeland Security

25    Investigations in Pittsburgh.

Martin Ryan - Direct                          12

1       Q.    And how long have you been employed at HSI?

2       A.    Since 2004.

3       Q.    Can you briefly describe your relevant duties in that

4  role.

5       A.    I'm investigator of many different federal crimes, but

6  I'm assigned to a group that investigates cyber crimes.

7       Q.    Do you have any training or experience investigating

8  child exploitation crimes?

9       A.    Yes.  I have basic training from our academy and also

10  I've been assigned to this group since 2013, approximately.

11      Q.    Is your testimony today based on your own

12  participation in an investigation involving Seth Hollerich?

13      A.    Yes.

14      Q.    Is it also based on your review of investigative

15  material and discussions with other law enforcement agents?

16      A.    Yes.

17      Q.    Agent Ryan, how did law enforcement come to learn

18  about Seth Hollerich?

19      A.    Our office received a lead from our cyber crime

20  center, also known as C3, which received a lead from a MEGA

21  Cloud application that there was child sexual abuse material

22  associated with an email address, JimHender94@yahoo.com.

23      Q.    What was the substance of that referral in that -- how

24  did agents come to learn that JimHender94@yahoo.com was

25  associated with child sexual exploitation material?

1      A.   Special agents with our Homeland Security

2  Investigation San Diego office had an undercover -- in an

3  undercover had an investigation which discovered this and also

4  sent it to MEGA, MEGA sent it to NCMEC, which is the National

5  Center for Missing and Exploited Children, and they sent that to

6  our cyber crime center which sent it to our office.

7          MR. BROOKS:  Your Honor, Mr. Ryan is reading off of

8  notes.  I was just wondering if I would be provided with those

9  notes or I could see those notes or --

10         THE WITNESS:  Sure.

11         MR. BROOKS:  I know that the government did distribute

12  some material to me yesterday, but I'm not sure if it's the same

13  notes or different notes.

14         MS. GAL-OR:  Yes, Your Honor, I did provide any notes

15  that were created by this witness yesterday.  And I've also

16  previously provided all of the reports about which this witness

17  has been testifying.

18         THE COURT:  So Mr. Brooks has those notes?

19         MS. GAL-OR:  Yes, Your Honor, Mr. Brooks has those

20  notes, as well as the reports upon which the information is

21  based.

22         THE COURT:  Mr. Brooks, do you have those notes with

23  you?

24         MR. BROOKS:  I do.  I didn't know if there were any

25  additional ones.

 1            THE COURT:  Thank you.  We can proceed.  Thank you.

 2  BY MS. GAL-OR:

 3       Q.   Agent Ryan, what is MEGA?

 4       A.   MEGA is a Cloud storage and file hosting service

 5  offered by MEGA Limited.  The service is offered through

 6  web-based apps.  MEGA mobile apps are also available on Android

 7  and IOS.

 8       Q.   And did HSI receive information from MEGA regarding

 9  the person who had created the folder containing child

10  pornography?

11       A.   Yes, and that also had association with email address

12  JimHender94@yahoo.com.

13       Q.   And you mentioned HSI also received another report

14  from the NCMEC; is that correct?

15       A.   That's correct.

16       Q.   I believe you said that was the National Center for

17  Missing and Exploited Children?

18       A.   Correct.

19       Q.   And if you could briefly describe what is the NCMEC?

20       A.   Sure.  It is a private corporation whose mission is to

21  help find missing children, reduce child sexual exploitation,

22  and prevent child victimization.  NCMEC works with families,

23  victims, private industry, law enforcement, and the public to

24  assist with preventing child abductions, recovering missing

25  children, and providing services to deter and combat child

1    sexual exploitation.

2        Q.   And, Agent Ryan, the NCMEC provided a report regarding

3    an application called Tumblr; is that right?

4        A.   That's correct.

5        Q.   What is Tumblr?

6        A.   Tumblr is an American microblogging and social

7    networking website.  The service allows users to post multimedia

8    and other content to short-term blogging.  Users can follow

9    other users' blogs.  Blogs can also make blog -- bloggers can

10   also make their blogs private.  Basically can share anything,

11   whether text, photos, links, or videos.

12       Q.   And did Tumblr make a report to the NCMEC?

13       A.   They did.

14       Q.   And what was that report?

15       A.   That identified user, all one word,

16   casualpsychicpersonbat, had uploaded images of apparent child

17   pornography.

18       Q.   And did Tumblr also provide an email address

19   associated with casualpsychicpersonbat?

20       A.   Yes.  That email address was JimHender94@yahoo.com.

21       Q.   And did agents review the file associated with that

22   cyber tip?

23       A.   Yes.

24       Q.   And what did that depict?

25       A.   It showed a minor female, approximately 12, performing

Martin Ryan - Direct                    16

1    oral sex on an adult male.

2        Q.   Did agents also obtain records and information from

3    Yahoo! related to the email address JimHender94@yahoo.com?

4        A.   Yes.  That information also was associated with email

5    JosieWales1869@yahoo.com.

6             And also IP address that returned to a Comcast account

7    for Karen Schultz at the address 5022 Cardox Road, South Park,

8    Pennsylvania, 15129.

9        Q.   Did agents do any research into who Karen Schultz was

10   and the address?

11       A.   Yes, and they found that it was likely that Seth

12   Hollerich also lived at the same address with Ms. Schultz and

13   that he was her son.

14       Q.   Did agents also obtain the contents of the email

15   account JimHender94@yahoo.com?

16       A.   Yes.

17       Q.   What did they find within those emails?

18       A.   They found that emails were forwarded to

19   JimHender94@yahoo.com from the email account of

20   Shollerich94@gmail.com.

21       Q.   Did agents at some point obtain a search warrant to

22   search the residence at 5022 Cardox Road in South Park,

23   Pennsylvania?

24       A.   Yes.

25       Q.   And when was that executed?

1          A.    That was on November 10, 2021.

2          Q.    And did agents encounter Mr. Hollerich at that time?

3          A.    Yes, and he was interviewed.  He was told that he was

4    not under arrest and free to leave.

5                From Special Agent Brandon Wargo's report

6    Mr. Hollerich stated that he has one -- had one cellular

7    telephone which was an AT&T wireless prepaid phone.

8    Mr. Hollerich stated that the device would be on his bed, where

9    it was later found.  Mr. Hollerich stated that he is the only

10   person with access to the device and it's password-protected.

11               Special Agent Wargo advised Mr. Hollerich as to the

12   nature of the investigation and why law enforcement was there.

13   Mr. Hollerich stated, it was always a mistake.  I always knew

14   this would happen.

15               Special Agent Wargo asked what Hollerich meant by

16   that, to which he admitted he had child pornography on his

17   cellular telephone.  Mr. Hollerich was asked for his definition

18   of child pornography, to which he stated, children under 18

19   engaged in sexual acts.

20               In a relation to the ongoing investigation,

21   Mr. Hollerich stated he was the person in control of an email

22   address, JimHender94@yahoo.com, and had utilized said email

23   address to create profiles on several file sharing, chatting and

24   social media platforms, including Wickr, Tumblr, and MEGA.

25               Mr. Hollerich was asked about an associated email

1  address of JosieWales1869@yahoo.com which was associated with

2  the email account of JimHender94@yahoo.com by a machine cookie.

3         Mr. Hollerich stated that he was the individual in

4  control of that account as well.

5         Mr. Hollerich stated he utilized the account to create

6  an additional Tumblr account.  Mr. Hollerich could not remember

7  if the account was created before or after the Tumblr account

8  associated with JimHender94@yahoo.com was taken down.

9         Mr. Hollerich stated at some point, however, that

10  JosieWales1869@yahoo.com Tumblr account was also disabled

11  because of child exploitation material being shared.

12      Q.   Did Mr. Hollerich make any statements about what he

13  searched for?

14      A.   Yes.  Excuse me a second.

15         He claimed that he last viewed child pornography a few

16  months ago.  Mr. Hollerich was asked if there was any child

17  pornography on his current cellular telephone to which he

18  responded yes, there was.

19         Mr. Hollerich claims he has been viewing and accessing

20  child exploitation material for approximately seven years, off

21  and on.

22         And the search terms that utilized to locate images of

23  videos -- images and videos of child sexual abuse material to

24  which he responded young, cuties, and teen.

25         Mr. Hollerich was about -- was asked about several

1  other known terms to which he stated he had no knowledge what

2  those terms meant.

3          Mr. Hollerich stated he is never searching for

4  anything in particular.  However, it is mostly of girls with no

5  specific age or sexual act.

6          Mr. Hollerich claims his attraction to child

7  exploitation material is more because it's taboo; further

8  explaining, I just get horny.

9          Mr. Hollerich stated he does masturbate and ejaculate

10 to child sexual abuse material.

11         Mr. Hollerich claimed the youngest individual he has

12 observed in child sexual abuse material is an infant or toddler,

13 claiming again he has masturbated to this type of file.

14     Q.    Agent Ryan, did agents recover a cell phone from

15 Mr. Hollerich's bedroom?

16     A.    Yes.

17     Q.    And is that cell phone listed in a forfeiture

18 provision of the indictment?

19     A.    Yes.

20     Q.    And did agents forensically extract and manually

21 review the contents of that cell phone?

22     A.    Yes.

23     Q.    Did agents find any child sexual abuse material on

24 that cell phone?

25     A.    Yes.  Media files that were discovered of images of

1    child pornography total of 391, with 383 being binary unique,

2    meaning there were a few duplicates.

3            As far as videos, videos of child pornography totaled

4    27, with 27 being binary, unique, meaning no duplicates were

5    found.

6        Q.   If you could please briefly describe some of the

7    images and videos found on the phone?

8        A.   One photograph depicts minor, white female,

9    approximately two to three years old.  The minor is fully nude,

10   positioned on her knees performing oral sex on an adult white

11   male.

12           Another photograph depicts minor female, who is

13   approximately ten to twelve years old, positioned away from the

14   camera, who appears to be fully nude performing oral sex on an

15   adult male.

16           In the forensic report from Special Agent Dave

17   Coleman -- excuse me, Special Agent Brandon Wargo, he noted that

18   this image was the subject of a referral from Tumblr to NCMEC

19   and was the basis of search warrant conducted on the Tumblr

20   account casualpsychicpersonbat, all one word.

21           As far as videos, one video approximately 45 seconds

22   in length, depicts a minor, white female who is approximately

23   six to seven years old, who is fully nude, positioned on top of

24   a fully nude adult white male.  The adult is observed

25   penetrating the vagina of the minor with his penis for the

1    duration of the video.

2            In another video, which is approximately 23 seconds in

3    length, it depicts a minor, white female who is approximately

4    four to five years old, laying on her back, exposing her vagina

5    to the camera.  Adult male -- adult, white male was observed

6    masturbating his erect penis to minor's vagina and ejaculating

7    onto her pelvis and vagina.

8        Q.   Agent, you mentioned that agents saw on the cell phone

9    images of a minor female performing oral sex on adult male that

10   appeared to be visually similar to the one that was -- sorry.

11           Did agents see on the cell phone images of a minor

12   female performing oral sex on an adult male that appear to be

13   visually similar to the one that Tumblr reported to NCMEC?

14       A.   Correct.

15       Q.   Is that the image charged in Count One of indictment?

16       A.   Yes.

17       Q.   Did agents also receive another cyber tip related to

18   Mr. Hollerich?

19       A.   Yes.  From Tumblr, related to email address

20   JimHender94@yahoo.com that was uploaded on or about March 18,

21   2021.

22       Q.   I'm sorry?

23       A.   I'm sorry.

24       Q.   That was the image charged at Count One of the

25   indictment; is that correct?

1        A.    Yes.

2        Q.    Was there another cyber tip reported by Tumblr to the

3    NCMEC related to the Josie69 Tumblr account?

4        A.    Yes.  User Josie69 uploaded three images of apparent

5    child pornography to that website.

6        Q.    Was one of those images also found on Mr. Hollerich's

7    phone?

8        A.    Yes.  That image depicted a minor female,

9    approximately eight to ten years old, positioned on her knees,

10   facing away from the camera.

11       Q.    And is that the image that is charged in Count Two of

12   the indictment?

13       A.    Yes.

14       Q.    Did law enforcement also obtain a search warrant for

15   the Tumblr account Josie69?

16       A.    Yes.

17       Q.    What did they find within the content of the Josie69

18   Tumblr account?

19       A.    I'm sorry.  Could you ask the question again.

20       Q.    Sure.  What did law enforcement find within the

21   contents provided by Tumblr for the Josie69 Tumblr account?

22       A.    I'm sorry.  Is there a report number you could refer

23   me to?

24       Q.    Sure.  And this is also provided to defense counsel.

25   And I believe this is a report drafted by Special Agent Brandon

1  Wargo, approved December 6, 2021, report number 8.

2       A.    Thank you.

3             Tumblr provided 357 images which were shared via the

4  Josie69 account.  Within those records were the images described

5  in the cyber tip, at least four different conversations.

6             Mr. Hollerich sent a file which appears to depict a

7  minor female who appears to be fifteen, sixteen years old, is

8  fully nude, facing the camera.  Her hands are on the buttocks of

9  what appears to be another minor female.  The first female is

10 spreading the buttocks of the other female.  And based on body

11 features, also appear to be a minor exposing her vagina and anus

12 to the camera.

13             I'm sorry, I need these glasses.

14             In exchange with another user, MA_TSU, Mr. Hollerich

15 said, ever want to chat or trade, HMU -- which stands for hit me

16 up -- into -- everything is basically LOL, but love the cuties.

17 He then sent the aforementioned image.

18      Q.    Thank you.  Thank you, Special Agent.

19             Were there any other communications with any other

20 individuals on Tumblr?  But if I could ask you not to say the

21 other user's name --

22      A.    I'm sorry.

23      Q.    -- just in the event since they are not part of this

24 case.

25      A.    Yes.  I'm sorry.

1        Another user on Tumblr?

2        Q.   Yes.  Any other communication with other Tumblr users

3   and Josie69?

4        A.   In exchange with another user, another user asked

5   Mr. Hollerich, so what ages do you like?  What kind of things do

6   you like?  Mr. Hollerich responded, pretty much everything, LOL.

7   But I love little cuties and jail bait, LOL.  Mr. Hollerich

8   further stated, love to watch my cock squeezing in them.

9        Q.   Agent Ryan, are you aware that Mr. Hollerich was

10  charged via a complaint in or around November of 2021?

11       A.   Yes.

12       Q.   And that he was placed on Pretrial supervision?

13       A.   Yes.

14       Q.   And various conditions were imposed at that time?

15       A.   Yes.

16       Q.   Including that he wouldn't violate any laws?

17       A.   Yes.

18       Q.   And that any devices he said he would have would be

19  disclosed and monitored by the probation office?

20       A.   Yes.

21       Q.   Is that right?

22       A.   Yes.

23       Q.   Did agents at any time learn from a family member that

24  Mr. Hollerich was communicating with a minor using the Facebook

25  account of his girlfriend, Tiffany Lovejoy?

Martin Ryan - Direct                                          25

1       A.    Yes.  That was about January 2022 that he was

2   communicating with a minor using the Facebook account of his

3   girlfriend, Tiffany Lovejoy, using one of her devices which was

4   not being monitored by Pretrial and Probation.

5       Q.    And this summer, this past summer, did the probation

6   office also contact Brandon Wargo, HSI Agent Brandon Wargo

7   regarding images that Mr. Hollerich was reviewing on his

8   monitored cell phone?

9       A.    Yes.

10      Q.    And did Agent Wargo review those images?

11      A.    Yes, he did.

12      Q.    And did you also review those images?

13      A.    I did.  After I discovered via testifying today, last

14  week I met with Probation Officer Megan O'Sullivan, who showed

15  me the information and the site that Mr. Hollerich accessed was

16  PIXIV.net.

17            And what I viewed was a series of compilations of

18  life-like computer-generated animae images.  One of those images

19  is described as a life-like computer-generated anime image

20  depicting of an adult male anally penetrating a partially

21  clothed ten- to eleven-year-old juvenile male.

22            Another such image would be described as a life-like

23  computer-generated anime image depicting an adult male with a

24  one- to two-year-old juvenile toddler female sitting on the

25  erect penis of the male.

1    Q.    And is it your understanding that Mr. Hollerich was

2    viewing these images while on pretrial release?

3    A.    Yes.

4    Q.    Agent, were you also there at the execution of the

5    first search warrant at Mr. Hollerich's home?

6    A.    Yes, I was.

7    Q.    And do you recall there being any issues or concerns

8    relating to Mr. Hollerich's mental health at the time?

9    A.    Yes.  I was not part of the interview.  But after all

10   of us were done searching, the interview was over, agents

11   started departing the residence.  Mr. Hollerich got up and

12   swiftly walked to the staircase and ran up the stairs to his

13   bedroom, creating kind of a barricade situation to where his

14   mother walked up the stairs -- ran up the stairs after him

15   screaming his name for him to come out.  We were screaming for

16   him to come out.  He eventually did come out and came back

17   downstairs.

18          In the bedroom where he ran, firearms were placed and

19   secured and placed in a corner, and it was discovered that a

20   rifle had been moved and placed on the bed by Mr. Hollerich in

21   that amount of time.

22   Q.    And did law enforcement have any concerns about that?

23   A.    Yes.  He made some statements that he had suicidal

24   thoughts in the past.  But I don't think he had them at the

25   moment.  But to prove so, by moving -- he went directly to the

Martin Ryan - Cross                                    27

```
 1   room and moved a weapon where there were many other items in the

 2   room that he could have obtained.  But we were feared -- not

 3   only for our own safety but his safety at that time.

 4        Q.   Thank you, Agent Ryan.

 5             MS. GAL-OR:  I have no other questions.

 6             THE COURT:  Thank you.

 7             Cross-examination, Mr. Brooks?

 8             MR. BROOKS:  Yes, Your Honor.  I have a few questions

 9   for Mr. Ryan.

10                        CROSS-EXAMINATION

11   BY MR. BROOKS:

12        Q.   So in this indictment, the first count dates back to

13   March of 2021?

14        A.   Yes, I believe so.

15        Q.   And the second count dates back to September of 2021?

16        A.   Yes.

17        Q.   And the third count is November of 2021; correct?

18        A.   Yes.

19        Q.   And as you said during your direct examination,

20   Mr. Hollerich was placed on bond back in November of 2021?

21        A.   Yes.

22        Q.   And that was almost a year ago; correct?

23        A.   Yes.

24        Q.   And the government mentioned potential violations

25   dating back to this past summer.
```

1          Just to be clear, these images were computer-generated

2     images?

3          A.   I believe so.  Some looked very, very life-like, but I

4     believe they were computer-generated.  I couldn't say

5     definitively either way.

6          Q.   Sure.  So if they're computer-generated, they wouldn't

7     involve humans; correct?

8          A.   Correct, but it depicted humans.

9          Q.   It wouldn't involve children because they're not

10    human; correct?

11         A.   It depicted children, sure.

12         Q.   But they're not human children?

13         A.   No.

14         Q.   Okay.

15              And those reports that you were reading off of, those

16    were drafted around the time of Mr. Hollerich's arrest; correct?

17         A.   I believe they're written at different times, but at

18    least one of them, yes.

19         Q.   And Mr. Hollerich had been investigated since March of

20    2021, thereabouts?

21         A.   Yes.

22         Q.   Some of those reports are written back in March of

23    2021, dating all the way through November of 2021?

24         A.   Yes.

25         Q.   Is that correct?

```
1         A.    Yes.

2         Q.    So all of the information that you testified to during

3    your direct, that's information that agents, Homeland Security,

4    and the United States government knew back in November of 2021?

5         A.    Yes.

6         Q.    Okay.

7               MR. BROOKS:  I have no further questions, Your Honor.

8               THE COURT:  Thank you.  Anything further?

9               MS. GAL-OR:  Nothing, Your Honor.

10              THE COURT:  All right.  Agent Ryan, you may step down.

11              THE WITNESS:  Thank you, Your Honor.

12         (Witness excused.)

13              THE COURT:  Ms. Gal-Or, do you have any other

14    witnesses?

15              MS. GAL-OR:  Yes, Your Honor.  The government calls

16    United States Probation Officer Leah Masciantonio.

17              THE COURT:  You're used to that, I guess.  Please step

18    forward.

19         (Administration of the oath.)

20              THE CLERK:  Please state your name and spell it for

21    the court reporter.

22              THE WITNESS:  Leah, L-E-A-H, Masciantonio,

23    M-A-S-C-I-A-N-T-O-N-I-O.

24                        DIRECT EXAMINATION

25    BY MS. GAL-OR:
```

Leah Masciantonio - Direct

1     Q.    Good morning, Officer.

2     A.    Good morning.

3     Q.    Could you please tell us where are you currently

4  employed?

5     A.    The U.S. Probation and Pretrial Services office.

6     Q.    How long have you been employed there?

7     A.    Thirteen years.

8     Q.    What are some of your duties in that role?

9     A.    I supervise defendants on Pretrial bond pending trial

10  and monitor conditions and report any violations or anything to

11  the Court.

12     Q.    Thank you.

13           And, Officer, are you currently assigned to this

14  matter?

15     A.    Yes.

16     Q.    Is it your understanding that Mr. Hollerich currently

17  lives with his girlfriend, Tiffany Lovejoy?

18     A.    Yes.

19     Q.    And is that in the residence in Bethel Park,

20  Pennsylvania?

21     A.    Yes.

22     Q.    And is it your understanding that during his Pretrial

23  supervision his devices were being monitored?

24     A.    Yes.

25     Q.    And at the time that his devices were being monitored

Leah Masciantonio - Direct

1    in June of 2022, were there any -- did you become aware of

2    images that were brought to your attention by Probation Officer

3    Megan O'Sullivan?

4        A.    Yes.

5        Q.    Did you see those images?

6        A.    I did not.  I was in the room when there was a meeting

7    held to view the images, but I didn't physically look at them.

8        Q.    During supervision of the defendant charged with

9    distribution of material depicting the sexual exploitation of

10   children, is Pretrial Services able to maintain constant

11   surveillance of the defendant inside his home?

12       A.    No.

13       Q.    How often during COVID times is Pretrial able to go

14   and inspect the residence?

15       A.    For defendants charged with a sex offense, we are

16   required to visit the home monthly.

17       Q.    Is there any way to determine if a defendant is

18   secretly using another individual's device?

19       A.    Only from monitoring the home, anything in plain view.

20   That would be the only way to determine that.

21       Q.    And that would only be based on monthly inspections?

22       A.    Correct.

23       Q.    And is there any way of knowing if the defendant

24   purchases a new device and doesn't disclose it to Probation?

25       A.    Again, only if we saw it in plain view or if it was

1    reported by a family member or someone else in the home.

2         Q.    Is the defendant currently on home incarceration or

3    any other restrictions in his movement other than being

4    monitored?

5         A.    No.

6         Q.    So he could leave the residence?

7         A.    At this time, yes.

8         Q.    And if that occurred, would Pretrial be able to

9    monitor in realtime his whereabouts?

10        A.    No.

11        Q.    So there would be no way of knowing if he would go and

12   buy another device or access a WI-FI in a public network or

13   something?

14        A.    No.

15        Q.    Ms. Lovejoy's expecting a baby, is that right, in

16   September?

17        A.    That's correct.

18        Q.    And one of the current conditions is that

19   Mr. Hollerich not have unsupervised access to a minor; is that

20   right?

21        A.    Yes.

22        Q.    Would it possible for Pretrial to ensure that

23   Mr. Hollerich doesn't have unsupervised access to a baby

24   residing in his own home?

25        A.    Would it be possible; is that the question?

Leah Masciantonio - Direct

1    Q.    Yes.   What are some of the ways that Pretrial would

2    able to determine that Mr. Hollerich is not having unsupervised

3    access to his children?

4    A.    We typically try to interview any other responsible

5    parties in the home that could ensure that he would not have

6    unsupervised contact, that maybe being Tiffany Lovejoy.

7           But, you know, if we're not there all the time, we

8    certainly wouldn't know if there was unsupervised contact.

9    Q.    And in this case, is it correct that Mr. Hollerich was

10   living with Ms. Lovejoy at the time that he was -- at the time

11   that he was looking at the images in June of 2022 that were

12   brought to your attention by Officer Megan O'Sullivan?

13   A.    Yes.

14   Q.    Officer, do you have any concerns or have you become

15   aware of any concerns regarding Mr. Hollerich's mental health or

16   mental conditions?

17   A.    Yes.  He's been in mental health therapy, attends --

18   has outstanding attendance and has shown progress.  But there

19   has been some reports of reoccurring -- a couple times of

20   reoccurring suicidal ideations where, you know, intervention was

21   needed, crisis support, things like that.

22   Q.    Thank you, Officer.  I have no other questions.

23   A.    Thank you.

24         THE COURT:  Thank you.

25         Cross-examination?

```
 1              MR. BROOKS:  Yes, Your Honor.
 2                        CROSS-EXAMINATION
 3   BY MR. BROOKS:
 4       Q.   Good morning, Ms. Masciantonio.  I just have a few
 5   questions.
 6              You've been monitoring Mr. Hollerich since November of
 7   2021?
 8       A.   Yes.
 9       Q.   Okay.  Have there ever been any petitions filed for
10   violations of his pretrial release?
11       A.   Just one.  The one filed September 1, 2022, alleging
12   that the defendant had -- continued to view child pornography.
13       Q.   And thus the child pornography we're talking about --
14   the alleged child pornography we're talking about dating back to
15   this past summer; is that correct?
16       A.   Yes.
17       Q.   Those computer-generated images?
18       A.   Yes.
19       Q.   That you did not see; correct?
20       A.   Yes.
21       Q.   Okay.  Have there been any other petitions?
22       A.   No.
23       Q.   As a result of that petition, Mr. Hollerich and the
24   United States probation office came to an agreement; is that
25   correct?
```

1       A.    Yes.

2       Q.    That he would not view -- that he would not possess

3  any other devices with access to the Internet; is that correct?

4       A.    That he would be restricted from accessing the

5  Internet at all.

6       Q.    Okay.  And as long as you've been supervising

7  Mr. Hollerich, has he lived with Ms. Lovejoy?

8       A.    Yes.

9       Q.    Have there been any instances where she had called you

10 with concerns about him violating his pretrial release?

11      A.    No.

12      Q.    Do you know of any instances other than the alleged

13 June incident where he has violated his pretrial release?

14      A.    That he had contacted a niece through the Facebook

15 page.  That's the only other one I'm aware of.

16      Q.    And was that investigated?

17      A.    By me?

18      Q.    To your knowledge, by anyone.

19      A.    No.  He -- the defendant had admitted to that contact.

20      Q.    And earlier you testified that you guys did monthly

21 visits of the home?

22      A.    Yes.

23      Q.    And when making those visits, with your own eyes you

24 didn't see any violations inside the home?

25      A.    No.

Leah Masciantonio - Cross

1    Q.   Okay.  And you said Mr. Hollerich is attending

2 counseling?

3    A.   Yes.

4    Q.   And he has outstanding attendance?

5    A.   Yes.

6    Q.   Has been attending counseling since November of last

7 year?

8    A.   Yes.

9    Q.   And that's one of his conditions of pretrial release;

10 correct?

11   A.   Yes.

12   Q.   Okay.

13        MR. BROOKS:  No further questions, Your Honor.

14        THE COURT:  Anything further?

15        MS. GAL-OR:  No.  Thank you, Your Honor.

16        THE COURT:  Ms. Masciantonio, thank you very much.

17 You can step down.

18        THE WITNESS:  Thank you, Your Honor.

19     (Witness excused.)

20        MS. GAL-OR:  The government has no other witnesses or

21 evidence to present, but we just would reserve the right to

22 argue at the end.

23        THE COURT:  Thank you.  Mr. Brooks, do you have any

24 evidence or witnesses that you'd like to present?

25        MR. BROOKS:  Yes, Your Honor.  I provided the Court

1    and the government with a few letters from family and friends of

2    Mr. Hollerich for the Court's consideration during this

3    proceeding.

4                At this time, I would like to call Tiffany Lovejoy as

5    a witness.

6                THE COURT:  All right.  Ms. Lovejoy, for the record,

7    is participating by video.  We will get her on the video.

8                Ms. Lovejoy, can you hear me?

9                THE WITNESS:  Yes, I can.

10               THE COURT:  All right.  Then, Ms. Eckenrode, would you

11   administer an oath, please.

12          (Administration of the oath.)

13               THE CLERK:  Thank you.  Please state your name and

14   spell it for the court reporter.

15               THE WITNESS:  My name is Tiffany Lovejoy,

16   T-I-F-F-A-N-Y, L-O-V-E-J-O-Y.

17               THE COURT:  All right.  Mr. Brooks, you can proceed.

18               TIFFANY LOVEJOY, a witness herein, having been first

19   duly sworn, was examined and testified as follows:

20                         DIRECT EXAMINATION

21   BY MR. BROOKS:

22       Q.   Good morning, Ms. Lovejoy.  Can you tell us a little

23   bit about yourself?

24       A.   Well, I live in Bethel Park, and I live with Seth, my

25   fiancée.  We just had -- we just had a baby.  I don't really

Tiffany Lovejoy - Direct

```
 1    know what else to say.

 2         Q.   Congratulations.

 3              How long have you known Mr. Hollerich?

 4         A.   About six, seven years.

 5         Q.   And what is your relationship with Mr. Hollerich like?

 6         A.   It's -- it's very good.  We've never had any problems.

 7    We, you know, we mainly stay at home and, just, you know, watch

 8    TV or, you know, hang out with each other for the most part.

 9         Q.   What does Mr. Hollerich do around the home?

10         A.   A lot of the, you know, outside work.  He helps me

11    with different chores around the house.  He actually pays for

12    half of the house and half of the utilities.  Yeah.

13         Q.   Earlier today, Mr. Hollerich's charges were read

14    against him in open court.

15              Were you aware of those charges?

16         A.   Yes.

17         Q.   And have you known that Mr. Hollerich had a pending

18    federal indictment for last -- almost the last year?

19         A.   Yes.

20         Q.   Okay.  And how do you feel about that?

21         A.   I mean, it's -- it's tough.  But I don't feel any

22    different towards Seth at all.

23         Q.   Do you think that these charges -- well, how does that

24    affect your relationship with Mr. Hollerich?

25         A.   It hasn't.  It really hasn't.  We're still, you know,
```

1  we're still together.  We're still going to raise our child, and

2  it really hasn't changed much.

3      Q.   Do you have any concerns about Mr. Hollerich being

4  around your child?

5      A.   No.

6      Q.   Now, could you describe the home in which you live

7  with Mr. Hollerich?

8      A.   It's located in Bethel Park.  It's a very nice

9  neighborhood.  Very -- it's very calm.

10      Q.   How many bedrooms are in this home?

11      A.   Three.

12      Q.   And how many people live in the home?

13      A.   Just me and Seth and now our child.

14      Q.   Are there any weapons in the home?

15      A.   No.

16      Q.   Were those weapons seized -- were any weapons that

17  Mr. Hollerich had seized at a result of his Pretrial conditions

18  back in November of 2021?

19      A.   They -- they actually told us to remove the

20  weapons from the home, and so those weapons were removed by

21  myself and family members.

22      Q.   Okay.  So there are no firearms or anything in the

23  home, though; right?

24      A.   No.

25      Q.   Are there any dangerous animals in the home?

1          A.     No.

2          Q.     How long have you and Mr. Hollerich lived together?

3          A.     Well, we just bought our house back in February, and

4    then I stayed with him a good bit of whenever we started dating

5    back in 2021.  I was back and forth between my parents' house

6    and Seth's house.  So for the most -- most of our relationship.

7          Q.     And in that time that you guys have lived together,

8    have there been any instances where you needed to contact

9    Pretrial or Probation about Mr. Hollerich's behavior?

10         A.     As far as like any -- any like violations, no.

11         Q.     Are you aware of an alleged violation that took place

12   in January of this year?

13         A.     Is it -- are you referring to talking to a niece, his

14   niece?

15         Q.     Yeah.  If you could describe what happened there.

16         A.     That was for December.  That was for Christmas.  We

17   had received a message from her that said, Merry Christmas.  So

18   we responded back.

19                I don't -- I was with him for that message.

20         Q.     Sorry I cut you off.  Was that message delivered to

21   your Facebook account?

22         A.     Yes.

23         Q.     Do you have a cell phone?

24         A.     I do.

25         Q.     Do you have a laptop?

```
1          A.    Yes, I do.

2          Q.    Do you have any other ways to access the Internet in

3    your home?

4          A.    Just by my laptop and phone.  I have two laptops.

5    One's for work and then one's for school.

6          Q.    Are those laptops password-protected?

7          A.    Yes, absolutely.

8          Q.    Do you know if Mr. Hollerich knows those passwords?

9          A.    He does not.

10         Q.    And what about your cell phone; does it have a pass

11   code?

12         A.    Yes.

13         Q.    Does Mr. Hollerich know the pass code for that cell

14   phone?

15         A.    No, he does not.

16               MR. BROOKS:  No further questions, Your Honor.

17               THE COURT:  Cross-examination?

18               MS. GAL-OR:  Yes.

19                            CROSS-EXAMINATION

20   BY MS. GAL-OR:

21         Q.    Good morning, Ms. Lovejoy.

22         A.    Good morning.

23         Q.    My name is Karen Gal-Or.  I'm the Assistant U.S.

24   Attorney here.

25               Congratulations on the baby.
```

Tiffany Lovejoy - Cross

```
 1        A.   Thank you.

 2        Q.   I have just a few questions for you today.

 3             You mentioned that the home that you share with

 4   Mr. Hollerich is a three-bedroom home; is that correct?

 5        A.   It is, yes.

 6        Q.   And do you and Mr. Hollerich sleep in the same room?

 7        A.   Yes.

 8        Q.   So you share one bedroom?

 9        A.   Yes.

10        Q.   Is it ever the case that he sleeps in a different

11   bedroom from you?

12        A.   Yeah.  He -- he actually does stay down in the game

13   room sometimes, like a man cave.

14        Q.   When he's down in the man cave, you're not always with

15   him; is that right?

16        A.   That is correct.

17        Q.   And I think you mentioned you have a cell phone and

18   two laptops; is that right?

19        A.   Correct.

20        Q.   Where do you generally keep those items, those

21   devices?

22        A.   My laptops are in my office, which is one of those

23   bedrooms.  My phone is usually on me.  I don't really part with

24   my cell phone.

25        Q.   When Mr. Hollerich texted a message to his niece, was
```

1    that using your cell phone?

2         A.    Yes.

3         Q.    And so at the time, was he actually holding and

4    writing in your cell phone to communicate at the time?

5         A.    Yes.

6         Q.    Was that the only time that he used your cell phone

7    during this period, beginning of November of 2021, or were there

8    other times?

9         A.    Unless he was calling, like he might have called his

10   mom.  But any time that he would use my cell phone I was with

11   him.

12        Q.    And do you have WI-FI in the home?

13        A.    I do, yeah.

14        Q.    And does Mr. Hollerich know the WI-FI password, to

15   your knowledge?

16        A.    He does, yes.

17        Q.    While you lived with Mr. Hollerich, has he had any

18   devices?

19        A.    I did -- I did purchase him a cell phone which was

20   monitored by Probation.  That was the only one, though.

21        Q.    And since November of 2021, have you looked at what

22   he's looking at during -- while he has that cell phone at all

23   times?

24        A.    No.

25        Q.    So you haven't monitored his Internet usage at all?

Tiffany Lovejoy - Cross

1      A.   As far as Internet usage, no, because it was already

2  being monitored by Probation.

3      Q.   Ms. Lovejoy, I understand that you'll be going home

4  with your baby.

5           And where do you plan to have the baby sleep when you

6  return home?

7      A.   In my -- right next to me in my room.

8      Q.   And is that the same room that Mr. Hollerich would

9  sleep?

10     A.   Yes.

11     Q.   How are you going to be able to ensure that he's never

12  left alone with the baby?

13     A.   We actually -- so there's multiple -- multiple ways.

14  Both of my parents, my father and my mother, are very involved

15  in my life, and they live right down the street as well.

16     Anytime that -- and even -- even -- we have a two-story,

17  like, the basement can be a separate entity, the previous owners

18  had separated two families in that house.  He could stay,

19  technically, downstairs and sleep downstairs and not have -- not

20  be, you know, unsupervised.  There are other ways to do that.

21  So --

22     Q.   Are you able to ensure --

23     A.   -- that's just one.

24     Q.   Thank you.

25           Would you be able to ensure, for instance, when you

```
 1   shower, go to the store, that someone will always be in the
 2   home?  Is that something you would be able to ensure?
 3        A.   Yes, because my dad does not work, and my mother is
 4   right down the road.  Both of them are equally available, along
 5   with my sisters and my brother.
 6        Q.   And are they --
 7        A.   If I needed help, yes, they would.
 8        Q.   And are they aware of the charges in the indictment?
 9        A.   Yes.
10        Q.   And have they told you that they would be able to come
11   to the home every single time you, for instance, shower?
12        A.   My mother and my father, yes.
13        Q.   Are you aware that during this past summer
14   Mr. Hollerich was looking at images and videos that appear to
15   depict the sexual exploitation of minors, animated minors?
16        A.   Yes.  When they came into the house, yeah, I was told
17   that.  But that was -- it was anime.
18        Q.   How do you know it was anime?
19        A.   Well, I -- I've seen anime.  It's very -- it's
20   actually very popular, like the Pokémon and all of that.  So I
21   am aware of some anime.
22        Q.   Did you see any of these images?
23        A.   No, I did not.
24             MS. GAL-OR:  No further questions.  Thank you.
25             THE COURT:  Mr. Brooks, do you have any further
```

1    questions?

2              MR. BROOKS:  Just one.

3                        REDIRECT EXAMINATION

4    BY MR. BROOKS:

5       Q.    If Mr. Hollerich is imposed conditions, would you be

6    willing to make sure that he abides by those conditions as a

7    condition of his pretrial release?

8       A.    Yes.

9       Q.    And you've done that in the past as well; right?

10      A.    Yes, I have.

11      Q.    And if there comes an instant where Mr. Hollerich is

12   violating his pretrial release, would you have any issue with

13   contacting Pretrial about this violation?

14      A.    No, I would have no issue.  No.

15             MR. BROOKS:  Thank you.

16             THE COURT:  I have several questions for you,

17   Ms. Lovejoy.

18             First of all, congratulations on your new addition to

19   the family.

20             Are you employed?

21             THE WITNESS:  Yes, I am.

22             THE COURT:  And do you work -- first of all, tell me

23   where you work.

24             THE WITNESS:  I work for Allegheny Health Network.

25             THE COURT:  And are you employed in the home?  In

1    other words, do you work from home or do you go into an office

2    somewhere?

3                THE WITNESS:  I do work from home, yes.

4                THE COURT:  How many days per week?

5                THE WITNESS:  Five days.

6                THE COURT:  And is it my understanding that you are

7    willing to assure that your baby will not be left alone with

8    Mr. Hollerich at any time, 24 hours a day, 7 days a week?

9                THE WITNESS:  I will ensure that, yes.

10               THE COURT:  And are you willing to take an oath to

11   that effect?

12               THE WITNESS:  Yes.

13               THE COURT:  Anything further from counsel?

14               MR. BROOKS:  No, Your Honor.

15               MS. GAL-OR:  No, Your Honor.

16               THE COURT:  Ms. Lovejoy, thank you.  You may continue

17   to participate in this hearing by listening in, but you're

18   excused as a witness.

19               THE WITNESS:  Thank you.

20          (Witness excused.)

21               THE COURT:  Mr. Brooks, I know you mentioned three

22   letters for the record.  For the record, would you identify each

23   of them and ascribe a number to each of them, please?

24               MR. BROOKS:  Sure.  Exhibit A -- one moment, Your

25   Honor.

```
 1              THE COURT:  That's all right.  Take your time.

 2              MR. BROOKS:  Apologies.  Exhibit A is a letter from

 3   Timothy Smerecky, who is a former co-worker of Mr. Hollerich.

 4              Exhibit B is from Alan Densmore, who is -- who

 5   works -- I guess is Mr. Hollerich's boss at the Castle Tavern

 6   South where Mr. Hollerich has worked for the last nine years.

 7              And Exhibit C is Amanda Lovejoy, who is the sister of

 8   Tiffany Lovejoy, who has known Seth for more than a year.

 9              THE COURT:  All right.  Is there any objection to

10   their admission?

11              MS. GAL-OR:  No, Your Honor.

12              THE COURT:  Then exhibits A through C are admitted

13   into the record.

14              Mr. Brooks, do you have anything else that you would

15   like to present other than argument?

16              MR. BROOKS:  No, Your Honor.

17              THE COURT:  Anything further, Ms. Gal-Or?

18              MS. GAL-OR:  No, just argument, Your Honor.

19              THE COURT:  All right.  Then we're going to take a

20   very brief break so counsel can prepare for their argument.

21   We'll reconvene at 10:20.

22          (Whereupon, a recess was taken.)

23              THE COURT:  Could I see counsel at sidebar for a

24   moment, please?

25          (Whereupon, sidebar conference held:)
```

1          THE COURT:  So one of the things I am considering is
2    whether Ms. Lovejoy could serve as a third-party custodian which
3    would give her certain duties that otherwise, you know, could
4    not really be imposed without that.  But she has not been vetted
5    as a third-party custodian.

6          I'm not saying I'm going to make that decision, but
7    before I do, I feel I need to have Pretrial investigate her for
8    that possibility because that's what they typically do.  I
9    wanted to raise that with both of you for your input.

10          I think what that would mean is we would have -- we
11   could certainly have oral argument today, or continue this
12   matter pending their determination of whether she would be,
13   assuming I go that way, and then reconvene.  I think if we did
14   that he would have to agree not to live at the home pending such
15   a thing.

16          And again, I am open for your input, comments,
17   suggestions.

18          Ms. Gal-Or?

19          MS. GAL-OR:  So the government would object to having
20   her serve as a third-party custodian for at least two reasons.
21   I think the first would be that it would be our position that
22   she's not an appropriate custodian given her emotional
23   relationship with him and her need to have him provide both
24   financially and other support for her child.  She may not be
25   able to objectively or want to objectively report any

1    violations.

2         But I think the evidence here that's already been

3    presented would also show she's not an appropriate custodian.

4    Among other things, she purposely gave the defendant her own

5    phone to communicate with a minor knowingly when that was a

6    violation of the terms of his conditions and she did that of her

7    own accord.

8         And then her ability to monitor his conduct at all

9    times, in the government's view, is limited given her prior

10   inability to monitor his Internet usage, his ability to travel

11   without her knowing.  And then, of course as a new mother and an

12   employed person, she just won't have the capacity to monitor him

13   at all times, particularly given the testimony that he does

14   spend some time, quite a bit of time, in the basement in his man

15   cave where she would not be able to watch him.

16        THE COURT:  All right.  Mr. Brooks?

17        MR. BROOKS:  I would have no issue with Ms. Lovejoy

18   being screened as a third-party custodian.  She would be an

19   appropriate third-party custodian.  She has lived with him; she

20   knows the conditions.  She is willing to do the things that, you

21   know, a third-party custodian is willing to do.  And if Pretrial

22   wants to investigate her, we would have no issue.

23        I would have to inquire as to where Mr. Hollerich

24   would live during the period where she's being investigated, but

25   I'm sure that wouldn't be an issue.

```
1              THE COURT:  I don't think that typically takes
2    particularly long, but I can't assure what it would be.  But I
3    would have to have your agreement that he would.  And I
4    understand if you object or can't agree to that, then we'll go
5    forward today.
6              MR. BROOKS:  Can I speak with him briefly?
7              THE COURT:  Absolutely.
8              One other thing to consider for both counsel is
9    whether there is another third-party custodian that the parties
10   agree on.  I understand the government's seeking detention here,
11   so you don't have to agree to anyone else.  But if there is
12   another person who would serve in that capacity, it's something
13   worth considering.
14             Again, I am not making a decision, as we stand here,
15   today on this issue, but it is something at least worth
16   considering.  But in the interim, assuming there are no
17   objections, he would have to reside otherwise --
18             MR. BROOKS:  If I could just talk to him about it?
19             THE COURT:  All right.  I welcome to hear anything
20   further from you, Ms. Gal-Or, that you wanted to make for the
21   record.
22             MS. GAL-OR:  No.  Thank you, Your Honor.  Just the
23   arguments I previously raised.
24             THE COURT:  Okay.  Then what we will do is, if you
25   need a few moments to talk with him, you can feel free to do
```

1  that.  If you want to step back into the jury room, if that's a
2  little bit more private, you can do that as well.
3          MR. BROOKS:  Thank you.
4          THE COURT:  So we'll just wait for you.
5          MR. BROOKS:  All right.
6      (Whereupon, sidebar conference concluded.)
7      (In open court.)
8          THE COURT:  For the record, we're giving Mr. Brooks a
9  few moments to consult with the defendant regarding an issue
10 that I raised during sidebar.  So I appreciate everyone's
11 patience while we give them a few moments to do that.
12     (Brief pause in the proceedings.)
13         THE COURT:  I want to advise counsel of the
14 conversation I just had with Ms. Masciantonio -- I'm sorry.
15         PROBATION OFFICER MASCIANTONIO:  Masciantonio.
16         THE COURT:  I have it now.  Thank you, and I
17 apologize.
18         She indicated to me with respect to a discussion about
19 a third-party custodian, that Ms. Lovejoy is an acceptable
20 third-party custodian based on the probation office's review
21 that was previously done.  But if you can fill us in on the
22 details of that, I would appreciate it.
23         PROBATION OFFICER MASCIANTONIO:  Yes, Your Honor.
24 Being that Ms. Lovejoy resides in the home with Mr. Hollerich,
25 we have already done a criminal history check on her.  She has

1  no criminal history of concern, I don't believe any at all.  But

2  I remember when we checked it, there was nothing of concern that

3  would say it was inappropriate for him to reside with her.

4          She has been cooperative in ensuring that all of the

5  devices in the home are password-protected if they weren't being

6  monitored by us.  She's been cooperative in showing me that

7  those devices are password-protected and that there's no other

8  way to access the Internet.

9          So, yes, we would accept her as a third-party

10  custodian, find her a suitable third-party custodian, should the

11  Court order that.

12          THE COURT:  Thank you very much.  I appreciate that.

13          Does counsel have any further questions regarding that

14  issue?

15          MR. BROOKS:  No, Your Honor.

16          THE COURT:  All right.  Then, let's proceed with

17  argument at this time.  Ms. Gal-Or?

18          MS. GAL-OR:  Thank you, Your Honor.  Pursuant to

19  Title 18, United States Code, Section 3142(e)(3)(E), there is a

20  rebuttable presumption in this case that no condition or

21  combination of conditions will reasonably assure the appearance

22  of the defendant as required and the safety of the community if

23  there is probable cause to believe that this defendant committed

24  an offense involving a minor victim, including the charged

25  offenses of distribution of child sexual exploitation material,

1  in violation of Title 18, United States Code,

2  Section 2252(a)(2).

3         To rebut that presumption, the defendant must come

4  forward with some credible evidence that the defendant does not

5  pose a danger to the community or that the defendant is a flight

6  risk.  And here, it's the government's position that the

7  defendant has not met that burden to overcome the presumption.

8         As an initial matter, the defendant's continued

9  release presents a substantial danger to the community.  Turning

10  first to the nature and circumstances of the offenses charged.

11  As this Court has heard, the defendant distributed multiple

12  images of child pornography and possessed hundreds of such

13  images and videos, including images and videos depicting the

14  sexual abuse of infants and toddlers.

15         The defendant admitted to masturbating and ejaculating

16  to child sexual abuse material.  He admitted that the youngest

17  individuals he has observed in child sexual abuse material are

18  infants and toddlers, and he admitted to masturbating to that

19  specific type of file.

20         The offenses he has been charged with are, of course,

21  very serious.  Child pornography is an especially heinous crime

22  because it takes advantage of the most vulnerable people in our

23  society, children.  And indeed, Congress deems the offense of

24  distribution of child sexual abuse material so seriously that it

25  imposed a mandatory minimum sentence of five years'

1    incarceration for that crime.

2          As I anticipate the defense counsel will argue the

3    defendant has, in fact, been released on bond after charged via

4    criminal complaint with possession for several months now, since

5    November of 2021.  However, the circumstances, in the

6    government's view, have substantially changed.

7          First, the defendant has been charged now via

8    indictment with distributing child pornography, not just

9    possessing those images and videos.

10         Further, the defendant has demonstrated, in the

11    government's view, that despite being placed on Pretrial

12    conditions he remains a danger to the community.  As this Court

13    has heard, while on pretrial release, the defendant sought and

14    viewed images that appeared to depict the sexual abuse of

15    minors, including sexual assault of what appears to be minors,

16    animated images of minors, as young as one or two years old

17    being sexually abused.

18         The Court heard from Agent Ryan who reviewed these

19    images and testified they appear to be anime images but very

20    realistic and life-like.

21         The government anticipates the defense counsel will

22    argue that the fact these images were anime means that he did

23    not, in fact, violate his conditions.  However, the federal law

24    specifically prohibits possession of such obscenity which is a

25    category of speech not protected by the First Amendment.

1          For instance, Title 18, United States Code,

2     Section 1462(a) makes it a crime to knowingly use an interactive

3     computer service for the carriage in interstate or foreign

4     commerce of:  obscene, lewd, lascivious or filthy books,

5     pamphlets, pictures, motion-picture film, paper, letter,

6     writing, print, or any other matter of indecent character.

7          Likewise, and even more specifically on point,

8     Title 18, United States Code, Section 1466(a)(B) makes it a

9     crime to knowingly possess a visual depiction of any kind,

10    including a drawing, cartoon, sculpture or painting, that

11    depicts a minor engaging in sexually explicit conduct; and is

12    obscene.

13         I think from the descriptions provided by Agent Ryan,

14    which are clearly anal and vaginal penetration of infants and

15    toddlers, that those drawings -- those anime life-like

16    representations would be deemed obscene under the law.

17         Further, even if it were not a crime to possess such

18    images, the defendant's actions on pretrial supervision, in the

19    government's view, show at least two things.  First, that he

20    maintains sexual interest in minors, including very young

21    minors; and second, that he is willing to violate the terms of

22    his pretrial supervision to satisfy that sexual interest.  That

23    alone, in the government's view, demonstrates that he is and

24    remains a danger to the community.

25         The defendant's argument, for instance, that his

1  current conditions and an additional condition of prohibiting

2  him from accessing the Internet will remove any risk imposed to

3  the community if he remains on bond.  The government disagrees.

4           As noted, the defendant here has demonstrated a

5  willingness to violate the terms of his supervision.  For

6  instance, as the Court heard testimony that he was willing to

7  use his girlfriend's phone to communicate with minors, a phone

8  that was not being monitored by Pretrial probation.  And he also

9  used his own phone to access obscene images depicting sexual

10 abuse of children.

11          For those reasons, there is reason to believe he will

12 continue to violate his conditions in various other ways to

13 satisfy his sexual urges.

14          In this day and age, electronic home monitoring and

15 any condition prohibiting from possessing devices in Internet

16 connectivity would not adequately address his ability to access

17 phones and computers.  Any monitoring would not apply to devices

18 owned by others in the home or those not disclosed to the

19 probation office.  And indeed, under the proposed release plan,

20 the defendant would continue to live in the same residence and

21 with the same person with whom he was living when, in the

22 government's view, he violated his government pretrial

23 supervision by viewing what appeared to be child pornography.

24          Ms. Lovejoy was not able, despite her best efforts, to

25 monitor his conduct then and could not, in the government's

1  view, with sufficient certainty be able to monitor his behavior

2  24/7 pending a trial in this matter.

3          The government also continues to be concerned that the

4  defendant poses a risk to his child with whom he would be living

5  under the proposed release plan.

6          As noted, the defendant has demonstrated and even

7  admitted to having a sexual interest in minors and toddlers,

8  including infants and toddlers, saying that he masturbates and

9  ejaculates to those images.  And allowing him to live in the

10  same residence as a baby under those circumstances is

11  concerning.

12          I'll just note a few notes from the testimony we heard

13  today.  For instance, as noted, Mr. Hollerich claimed that he

14  did masturbate to files containing sexual abuse of infants and

15  toddlers.  On his cell phone, there were at least one image and

16  one video depicting the sexual abuse of minors as young as two

17  to three years old performing oral sex as well as vaginal

18  intercourse with adult males.  And in communications found on a

19  Tumblr account that Mr. Hollerich controlled, he wrote that he

20  pretty much loved everything, but particularly little cuties and

21  jail baits, stating, love to watch my cock squeezing in them.

22          The government believes those are very concerning

23  statements, very concerning evidence that is sufficient to show

24  that he would be, in fact, a danger to any minors with whom he

25  would have any contact, particularly unsupervised contact.

1          It's the government's view it's not reasonable to have

2   Ms. Lovejoy be able to monitor his conduct at all times.  Again,

3   despite best efforts, including while she sleeps, showers, goes

4   to the grocery store, Ms. Lovejoy testified that he slept

5   sometimes in the basement, spent quite a bit of time there where

6   again she would not be able to supervise his conduct.

7          Turning next to the weight of the evidence against the

8   defendant.  As the Court heard, the government believes there is

9   very strong evidence in this case.  Of course, while the

10  defendant is entitled to the presumption of innocence, there

11  were multiple search warrants conducted that revealed the

12  defendant's cell phone contained hundreds of images and videos

13  of child sexual abuse material, including images that were

14  distributed over Tumblr and other social media sites.  And

15  further, the defendant, after being interviewed, admitted to

16  distributing and possessing child sexual abuse material.

17         Quickly turning to the history and characteristics of

18  the defendant.  He does not have any criminal convictions, but

19  the evidence in this case reveals that his conduct is serious

20  and ongoing.  He admitted to the agents that he has been viewing

21  these types of images on and off for approximately seven years,

22  and in the government's view, the conduct from the past summer

23  showed us that his interest and the conduct continued.

24         I also think, again, that it's very important for the

25  Court to note that there is a clear, in the government's view,

1  willingness to violate while on pretrial release.

2          It's again the government's position that the

3  defendant's conduct would pose a serious danger to minors in the

4  community, both through his online conduct, in his community,

5  and potentially in his own residence.

6          I'll finally note briefly there has been evidence

7  presented today that Mr. Hollerich has -- is potentially a

8  suicide risk, has potentially had some suicidal ideations.

9  Pursuant to Title 18, United States Code, Section 3142(g)(3),

10  the Court must, when determining detention or release, consider

11  the person's mental condition.

12          As the Court, I believe, is aware, defendants who are

13  charged with these types of sexual exploitation offenses are at

14  a very high risk of suicide.  An analysis of an FBI case

15  reporting between July 2015 and June of 2016 revealed at least

16  23 suicides, 6 attempted suicides, and threats of suicide by

17  others under investigation for crimes involving sexual

18  exploitation of children.  And courts have held that suicide is,

19  in fact, a risk of flight that would warrant a detention in

20  those cases.

21          I'll note for the record two cases that, in

22  government's view, are factually similar.  One is United States

23  vs. Albertson, a case from the middle district of Pennsylvania

24  in which the Court held that the weight of the evidence against

25  the defendant indicated there were no conditions of release that

1    could assure the safety of the community considering among other

2    factors that defendant had attempted suicide in the past and

3    that he had been hospitalized.  The Court held that based on

4    those factors, among others, it would be judicially

5    irresponsible for the Court to grant the defendant release.

6          Likewise, in United States vs. Valle-Irizarry, a case

7    from the district of New Jersey, the Court considered the fact

8    that the defendant had a history of mental health disorders and

9    suicide attempts in finding detention was warranted.

10          So given all of those factors, considering all of the

11    various factors the Court must consider, it would be the

12    government's position that the defendant has not overcome the

13    presumption in this case and there is, in fact, no set of

14    conditions that would ensure the safety of the community and his

15    continued appearance in this case.

16          THE COURT:  Thank you very much.

17          Mr. Brooks?

18          MR. BROOKS:  Your Honor, I understand this is a

19    presumption case, but I do believe Mr. Hollerich has rebutted

20    that presumption quite thoroughly.

21          To begin, the government has said that the situation

22    has changed between November and now.  I would say that in some

23    ways, yes, it has, but in many ways it has not.

24          In the ways it has not, these charges date from March

25    of 2021, September of 2021, and November of 2021, all of these

1  allegations, all of these reports were written at that time.

2  The government chose to charge these crimes differently in

3  August of 2022.  But that does not change what the allegations

4  were then, it does not change what they were now.  Everything in

5  that instance is the same.

6        Things that have changed, however, are there were

7  ongoing plea negotiations during -- from November 2021 until

8  August of 2022.  The parties were not able to come to an

9  agreement and so an indictment was filed.  That has changed.

10  But other than that, the allegations have not changed.

11        I would point out that the standard for pretrial

12  release is a condition or set of conditions that can assure the

13  appearance of Mr. Hollerich and the safety of the community.

14        Mr. Hollerich is appearing in court voluntarily today.

15  It's not like he's running from this case.  He's not going

16  anywhere.  We can reasonably be assured that he is going to come

17  to court when he's required to based on his presence here today,

18  based on the fact that he has not tried to run from this in any

19  way.

20        And we're talking about the safety of the community.

21  The community is safe.  Mr. Hollerich has been on bond since

22  November of 2021.  He has not violated any laws.  He has not --

23  there has been one petition for -- a petition for a violation of

24  his pretrial release.  I would argue that his pretrial release

25  was not violated.  He was ordered not to view depictions of

1    child pornography.  I would argue that animated child

2    pornography is not child pornography.  We are talking about

3    cartoons.

4           I understand that the government has cited some

5    statutes.  I would argue that the Supreme Court talked about

6    virtual child pornography in Ashcroft v. Free Speech Coalition,

7    122 S.CT. 1389.  It's a 2002 case in which the Court talked

8    about virtual child pornography and ultimately there were no

9    children being harmed.

10          The Court said that a statute violating virtual child

11   pornography was overbroad because there were no -- the actual

12   harm in child pornography cases is that children are being

13   harmed.  We're talking about a situation where there is anime,

14   cartoons, virtual child pornography, whatever it may be.  That's

15   something that defense counsel's not seen, so I can't adequately

16   describe what it even is.  But we're talking about something

17   that we are all fairly certain does not involve actual people.

18          In this case, Pretrial recommends Mr. Hollerich's

19   release with certain conditions.  He's willing to abide by those

20   conditions.  He has abided by the conditions that were imposed

21   in November of 2021 and he will continue to do so if he is

22   granted his continued release.

23          There is no allegation in this case of any sort of

24   harm to any people in the community.  There's no allegation that

25   he has tried to harm a minor child or expressed a desire to harm

1   a minor child in any real concrete way.  There is no allegation

2   that he's produced any sort of child pornography as well.

3           So the idea that he is now going to turn into someone

4   who has been on pretrial release for production and distribution

5   with those allegations, he's -- sorry, possession and

6   distribution, he's not going to be someone who produces child

7   pornography or harms children.  That's not based on any fact.

8   That's based on, you know, I guess feelings.  But it's not based

9   on any sort of concrete evidence that we can point to say that

10  perhaps that's something that would happen.

11          The government made a point to talk about suicide risk

12  in this case.  As Agent Masciantonio testified to earlier,

13  Mr. Hollerich has been outstanding in his attendance at mental

14  health meetings.  That was ordered by Pretrial.  He's been doing

15  that since November of 2021.

16          In the Pretrial report, they note that he voluntarily

17  agreed to do in-patient mental health treatment back in November

18  of 2021.  So this is not someone whose mental health you should

19  be concerned about as long as he is on pretrial release because

20  he's going to his meetings.  They are a condition of his

21  release.

22          If he does not go to his meetings, then a petition can

23  be drawn and we can then have this -- we can talk about whether

24  or not his mental health is stable and whether or not he's

25  violating his conditions.  But as for now, he is not violating

1    those conditions because he's going to those meetings.

2              The government also pointed out some sort of

3    communication between a minor and Mr. Hollerich in January of

4    2022.  Again, that's something that defense counsel does not

5    have any evidence of.  It's my understanding, through Agent

6    Masciantonio's testimony, that that was not thoroughly

7    investigated.  My understanding is that it was a message sent by

8    Mr. Hollerich's niece to him around the holiday season which he

9    responded to and that it's not as if he is doing something

10   unseemly.  Yes, it is a violation of his pretrial release, but

11   it is not something that would cause any concern for there being

12   a danger to the community.

13             Mr. Hollerich has a steady home situation and a

14   third-party custodian, his fiancée, Tiffany Lovejoy.  Again,

15   there is stability in his life.  He's not a flight risk.  He's

16   worked at that job for nine years.  He has bonds in the

17   community.  Ms. Lovejoy's family is in the courtroom today

18   supporting Mr. Hollerich as well.  He has community support.

19   He's not, again, not a flight risk or a danger.

20             He has no criminal record.  There are no crimes in his

21   background.

22             He has voluntarily consented to not having any

23   Internet access.  As Officer Masciantonio has said, Ms. Lovejoy

24   has shown to Probation that he does not have access to any cell

25   phones or computers, any video gaming system, any tablets,

1  anything that would allow him access to the community -- sorry,

2  access to the Internet.  And if he were to purchase something

3  with Internet access, Ms. Lovejoy assured the Court that she

4  would take appropriate actions.  Probation believes she would

5  take appropriate actions.  That's why she is considered a

6  suitable third-party custodian.

7          Additionally, there are conditions short of pretrial

8  detention that would ensure his return and the safety of the

9  community.

10          The home, as Ms. Lovejoy said, actually has two floors

11  with a lock between those floors.  It was at one point a

12  two-family home that has been converted to a one-family home.

13  If there are concerns about him being around the baby, there are

14  ways to maintain a distance between Ms. Lovejoy and the baby and

15  Mr. Hollerich short of him being incarcerated pretrial.

16          The government's spent a lot of time talking about

17  these allegations.  Again, these are all allegations that have

18  been known for over a year.  They are only allegations.

19  Mr. Hollerich is not guilty of anything.  Those statements that

20  the government read to the Court are allegations again.  There

21  is no reason for the Court to believe that Mr. Hollerich is

22  guilty of anything at this point.

23          For those reasons, I would say Mr. Hollerich has

24  rebutted the presumption of pretrial detention and that he

25  should be allowed to remain in the community with the conditions

1  imposed -- conditions suggested by Pretrial which include not

2  possessing a firearm, not using drugs.  He's, in my

3  understanding, willing to continue with substance abuse

4  treatment.  So it's not as if he will be able to use drugs and

5  no one would know.  He would be tested for those things.  And he

6  would be willing to do inpatient or outpatient for those.  And

7  he has agreed to not use the computer.

8         So for those reasons, I would argue Mr. Hollerich is

9  not a flight risk.  He's not a danger to the community.  And he

10 should not be detained pretrial in a case that has been around

11 for almost a year at this point in which he has not committed

12 any new offenses.  He has not had any, you know, I would argue,

13 violations of his pretrial release.  There is no reason to

14 remove him from a stable situation and throw him into

15 incarceration at this point.

16        Thank you.

17        THE COURT:  Thank you.  Ms. Gal-Or, do you have

18 anything further you'd like to add?

19        MS. GAL-OR:  Very briefly, Your Honor.  I would note

20 the decision that was cited, the Supreme Court decision did not

21 go to the statutes that I cited which are obscenity statutes

22 which were in no way called into question by the Ashcroft

23 decision.

24        THE COURT:  Thank you.

25        Ms. Eckenrode, would you see if Ms. Lovejoy is still

1    with us?

2                THE CLERK:  Yes, Your Honor.

3                If you're in position to turn your camera back on

4    and/or unmute yourself.  Thank you.

5                THE COURT:  Ms. Lovejoy, can you hear me?

6                MS. LOVEJOY:  Yes, I can.

7                THE COURT:  One of the matters that has been suggested

8    is your service as a third-party custodian in connection with

9    the potential release of Mr. Hollerich.

10               Do you have an understanding of what that means?

11               MS. LOVEJOY:  It -- I'm thinking, like it would just

12   be like how I have been monitoring, you know, anything that

13   pretty much he does.  That's what I would take that as.

14               THE COURT:  All right.  Let me give you a little

15   further explanation on that and then I have some questions for

16   you.

17               A third-party custodian can be assigned in certain

18   cases and appointed by the Court to ensure several things.

19   First, the appearance of a particular defendant at all court

20   proceedings.  Second, to monitor the conduct and assure that the

21   particular defendant is abiding by all of the conditions that

22   are imposed by a judge for a pretrial release.  And finally, to

23   notify the Court and the probation office in the event that for

24   any reason and based on any condition the defendant fails to

25   abide by what the conditions are that have been imposed.

1          Do you understand essentially, based on what I've told

2     you, what a third-party custodian is charged to do and required

3     to do?

4          MS. LOVEJOY:  Yes.

5          THE COURT:  Are you willing to serve in that capacity

6     with respect to Mr. Hollerich?

7          MS. LOVEJOY:  Yes.

8          THE COURT:  All right.  Do you have any questions

9     about what your responsibilities would be?

10         MS. LOVEJOY:  No.

11         THE COURT:  All right.  Then I'm going to get back to

12    you at a later point in this proceeding.  Please stay with us

13    here.

14         All right.  I want to turn to my findings and

15    conclusions, and I very much appreciate the excellent advocacy

16    that I've heard today.

17         I will note that the government is seeking to detain

18    Mr. Hollerich based upon the nature of the offenses that were

19    charged.  And the government has asserted, as it may do, that

20    Mr. Hollerich is a danger to the community and there is a flight

21    risk with respect to him.

22         Those arguments are certainly appropriate under these

23    circumstances and the government certainly is entitled to seek

24    detention based upon those circumstances.

25         The government asserts that there is a rebuttable

1    presumption that detention is required because of the nature of

2    the offenses charged.  I agree that there is a rebuttable

3    presumption that applies here for that reason, based upon the

4    charges in the indictment and the penalties that may be imposed

5    if Mr. Hollerich is convicted or otherwise pleads guilty.

6            That is a rebuttable presumption, which means that it

7    can be overcome by Mr. Hollerich.  That places on him the burden

8    of producing some credible evidence to rebut it.  That burden

9    isn't heavy, and I do find here that Mr. Hollerich has offered

10   some relevant evidence that does not eliminate the presumption

11   altogether, and certainly the presumption remains a factor for

12   me to consider.

13           Turning to the specific factors that the Bail Reform

14   Act requires me to consider, the first being the nature and

15   circumstances of the alleged offenses.

16           I will note that without reviewing in great detail the

17   nature and circumstances, the evidence as presented by Agent

18   Ryan confirmed that accounts that were controlled by

19   Mr. Hollerich accessed and distributed multiple images and that

20   there were many more images that were obtained through a search

21   of his cell phone.  Those images included images that were

22   disturbing, including the depiction or videos of sexual acts

23   between minors and adult males.

24           I will note that when the search was conducted,

25   Mr. Hollerich admitted that there was child pornography on his

phone, that he had been viewing for approximately seven years
and that among the search terms used were terms such as "young,
cuties, and teen"; that the searches according to him, based
upon a statement given or at least comments given, that it was
mostly girls.

He admitted masturbating to child pornography, and
certainly the images and videos that were revealed showed, among
others, a two- to three-year-old engaging in oral sex with an
adult male; a ten- to twelve-year-old engaging in oral sex with
an adult male; a video of a minor, age approximately six or
seven, with an adult male on top of that minor with penetration
occurring; and another minor aged around four or five, exposing
her vagina with an adult male masturbating and ejaculating.

I'll note that, among other things, there were files
sent by Mr. Hollerich to others and in communications with
another person.  He indicated, among other things, he likes
pretty much everything, including little cuties and jail bait,
and hopes to have his cock squeezed into them.  He also
suggested they could chat or trade and asked to be contacted or
hit me up.

I certainly consider the nature and circumstances of
those offenses to be quite serious, and if proven, subject to a
significant jail term and certainly deeply offensive on many
levels.  So I certainly consider those offenses to be quite
serious.

1        In terms of the weight of the evidence, I agree here

2   that the weight is strong.  First of all, a grand jury returned

3   a three-count indictment charging Mr. Hollerich with both

4   possessing and distributing images and/or videos of child

5   pornography including very young children.

6        Also having heard the testimony of Agent Ryan, I

7   believe based on the evidence found in the cell phone and the

8   statements -- certain statements made by Mr. Hollerich that the

9   weight of the evidence here is significant.

10        Turning to the history and characteristics of

11   Mr. Hollerich.  I'll note that he currently resides with his

12   fiancée, Ms. Lovejoy, in the Bethel Park area.  He is a native

13   of this area.  He has been employed at Castle Tavern South for

14   approximately nine years.  He has indicated that he wishes to

15   return to the home that he shares with Ms. Lovejoy in which,

16   according to at least the testimony, there are no dangerous

17   weapons or firearms.

18        He has, as noted during the testimony here today,

19   based upon the criminal complaint that was filed, been on

20   conditions of release for some period of time, is regularly

21   attending mental health sessions.

22        There is, according to Pretrial Services, only one

23   instance of any criminal record, that occurring back in 2015.

24   There has been no evidence presented to me that at any time

25   Mr. Hollerich has been charged with production of child

1  pornography or has been charged with attempting to or harming a

2  minor or expressing an intent to do so.

3        I will note, as we heard from Ms. Masciantonio, that

4  there was a violation of his previous conditions of pretrial

5  release based on the criminal complaint.  That included

6  reviewing certain anime child pornography and there was also

7  some testimony about Mr. Hollerich sending a message to a niece.

8  Based upon what I heard, that message was sent -- first there

9  was a message sent by the niece, and the return was in the

10 presence of Ms. Lovejoy.  So certainly I acknowledge that there

11 have been alleged violations which led to a previous petition

12 being filed.  I've also reviewed the recommendation at that time

13 of the probation office.

14        I have also considered the nature and seriousness of

15 the danger to the community as well as the prior suicide

16 ideations expressed by Mr. Hollerich.  Certainly, these sorts of

17 crimes are not countenance which with Mr. Hollerich has been

18 charged.  They are, as I note, serious.  And certainly any

19 continued behavior of that type would be dealt with very

20 seriously if brought before, I'm confident, any judge in this

21 court.  So I don't diminish the nature of the offenses charged

22 or the potential danger to the community if appropriate

23 conditions are not imposed.

24        I have also reviewed the recommendation of the

25 Pretrial Services office in which they have suggested amended

```
 1   conditions of release.
 2           I have also reviewed the defendant's motion to modify
 3   those previous conditions as well as the government's response
 4   to those.
 5           So I feel I, based on the efforts of counsel and the
 6   testimony here today, have a good sense of the history of this
 7   case and certainly feel prepared at this point to indicate what
 8   my conclusions are going to be here.
 9           Based upon the evidence presented, I am going to order
10   that Mr. Hollerich be released based upon amended conditions of
11   release, and I am going to be appointing Ms. Lovejoy as a
12   third-party custodian in that regard.
13           I understand the government's disagreement with that
14   conclusion and certainly the government, if it feels strongly
15   about this or feels it is necessary, has the right to appeal any
16   decision that I make here today.
17           But I do find that, based upon the principles of the
18   Bail Reform Act, there are conditions that would reasonably
19   assure Mr. Hollerich's appearance and the safety of others in
20   the community.
21           So at this time, I'm first going to turn to
22   Ms. Lovejoy.  Ms. Lovejoy, can you still hear me?
23           MS. LOVEJOY:  Yes, I can.
24           THE COURT:  All right.  I previously informed you of
25   the duties of a third-party custodian and you indicated that you
```

1  understand those duties.  Let me reiterate those with you here

2  at this point.

3          By agreeing to serve as a third-party custodian, you

4  are agreeing to engage in certain requirements.  First, you will

5  be required to supervise Mr. Hollerich and ensure that he abides

6  by the conditions that I'm going to impose.  Secondly, you must

7  make your best efforts to ensure that he appears for all court

8  proceedings and other matters that the probation office might

9  require him to do.  And you are also, and most importantly,

10  required to notify the Court in the event that Mr. Hollerich

11  violates any of the conditions that I am imposing here today.

12          Do you understand what your responsibilities are?

13          MS. LOVEJOY:  Yes.

14          THE COURT:  Are you willing to serve as a third-party

15  custodian and undertake those responsibilities?

16          MS. LOVEJOY:  Yes.

17          THE COURT:  Do you agree that in the event that there

18  is any violation, no matter how minor it may be, you would

19  immediately notify the probation office and the Court of that

20  violation?

21          MS. LOVEJOY:  Yes.

22          THE COURT:  All right.  Ms. Eckenrode, would you

23  administer an oath, please.

24          THE CLERK:  Yes, Your Honor.

25      (Administration of the oath.)

1              THE COURT:  Thank you.  All right.  Mr. Hollerich, I'd

2    like you to step forward, please, so I can review these

3    conditions with you.

4              (Mr. Hollerich steps forward.)

5              THE COURT:  Mr. Hollerich, you were previously placed

6    on certain conditions, and I'm amending those conditions today.

7    I'm going to review all of them with you.  You will also receive

8    a written copy of them after this proceeding here today.

9              If at any time while reviewing these conditions you

10   didn't hear me or you didn't understand what that condition

11   means, please stop me, and I will review that condition with you

12   again.

13             Do you understand how we're going to proceed at this

14   time?

15             THE DEFENDANT:  Yes, I do, Your Honor.

16             THE COURT:  Do you understand the importance of

17   abiding by every one of the conditions that I'm about to impose?

18             THE DEFENDANT:  Yes, I do, Your Honor.

19             THE COURT:  Then I'm going to review all the

20   conditions with you understanding that only some of them have

21   been amended.  But I'm going to review everything that is in my

22   order, all right?

23             First of all, you must not violate any federal, state,

24   or local law while you are on release.

25             If it is allowed by law, you must cooperate in the

1  collection of a DNA sample.

2          You must advise the Court or Pretrial Services before

3  you make any change to where you live or your telephone number,

4  and that must be done in writing.

5          You must appear in court as required, and if you are

6  convicted, you must surrender to serve a sentence that the Court

7  may impose.

8          An appearance bond was previously entered in this case

9  and that appearance bond remains in effect at this time.

10          As a reminder, that is an unsecured appearance bond,

11  which means that you do not have to pay that amount but it may

12  be forfeited if you fail to appear for court or fail to abide by

13  the conditions that I am imposing.

14          In addition, you are placed in the custody of

15  Ms. Lovejoy as a third-party custodian.

16          Did you hear her requirements as a third-party

17  custodian?

18          THE DEFENDANT:  Yes, I did, Your Honor.

19          THE COURT:  In addition, you must report to

20  supervision by and report for supervision to the United States

21  Pretrial Services office.  Their telephone number, if you need

22  it, is on the conditions of release.

23          You are restricted in your travel to the Western

24  District of Pennsylvania.

25          You are to avoid all contact, whether that is direct

1    or indirect, with anyone who may be a victim or a witness in the

2    investigation or prosecution of your case.

3            You shall have no direct or indirect contact with any

4    minor except in the presence of an adult who is approved by

5    Pretrial Services and who is aware of the pending charges

6    against you.  That includes the infant that was just born.

7            Do you understand that you may not have any

8    unsupervised contact with your baby?

9            THE DEFENDANT:  I do, Your Honor.

10           THE COURT:  All right.  You must get mental or medical

11   or psychiatric treatment as required.  That would include a

12   mental health assessment and/or psychiatric evaluation, and you

13   must complete any treatment as that is directed by the Pretrial

14   Services office or your supervising officer.

15           PROBATION OFFICER MASCIANTONIO:  Your Honor?

16           THE COURT:  Yes.

17           PROBATION OFFICER MASCIANTONIO:  Can we have the

18   condition read -- he's already had a mental health assessment

19   and psychiatric evaluation.  Can we have it read that he just

20   continue in those services?

21           THE COURT:  Sure.  Do you understand that?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Since you've already had the evaluation, I

24   will strike that part of it but we'll request and insist that

25   you complete all of the treatment that you're currently

1    undergoing.

2          You may not possess a firearm, a dangerous weapon, or

3    a destructive device.

4          You may not use or unlawfully possess any narcotic

5    drug as that is defined by law unless it has been specifically

6    prescribed for you by a licensed medical practitioner.  That

7    includes any controlled substance or narcotic drug as defined by

8    law.

9          And you must also submit to testing for a prohibited

10   substance if that is required by the Pretrial Services office.

11   That testing can be used with random frequency and may include

12   urine testing, the wearing of a sweat patch, a remote alcohol

13   testing system, and/or any other form of prohibited substance

14   screening or testing.

15         You must continue to participate in a program of

16   inpatient or outpatient substance abuse therapy and counseling

17   if that is directed by the Pretrial Services office.

18         You also will be restricted in your location to home

19   detention.  That means that you are restricted to your residence

20   at all times except for employment, education, religious

21   services, medical substance abuse, or mental health treatment,

22   attorney visits, court appearances, court-ordered obligations,

23   or any other activities as long as they are approved in advance

24   by the Pretrial Services office.

25         That location monitoring will be as directed by the

1   Pretrial Services.  You must pay all or part of that cost of

2   location monitoring based on your ability to pay as that is

3   determined by the Pretrial Services office.

4           You must report as soon as possible to Pretrial

5   Services any contact that you have with law enforcement

6   personnel.  That includes a traffic stop, questioning, or an

7   arrest.

8           And there will also be restrictions on your use of the

9   Internet which I'm now going to go over with you.

10          You shall not purchase, possess, or use a computer, a

11  cell phone with Internet access, or other electronic devices

12  capable of storing, recording, or replaying electronic media or

13  data files at any location.  That includes your place of

14  employment or any other place that you are authorized to visit

15  despite being on home detention.

16          You shall not access any Internet service provider,

17  bulletin board system, or any other public or private computer

18  network or service at any location.  That includes any devices

19  located in your home that are the property of Ms. Lovejoy,

20  including two laptops and a cell phone.

21          You shall consent to periodic inspection by the

22  Probation or Pretrial Services officer of any cell phone that

23  you possess to ensure compliance with this condition.

24          You shall abide by all of the provisions of your

25  computer restrictions, that being no access to the Internet

1   whatsoever.

2           Did you understand all of the conditions that I just

3   reviewed with you?

4           THE DEFENDANT:  Yes, I did, Your Honor.

5           THE COURT:  Do you agree to abide by all of those

6   conditions?

7           THE DEFENDANT:  I do, Your Honor.

8           THE COURT:  Specifically, do you understand, among

9   other things, that you may not access the Internet in any way?

10          THE DEFENDANT:  I do, Your Honor.

11          THE COURT:  Do you understand that you may not attempt

12  to access any electronic device that is in your home that is in

13  the possession of Ms. Lovejoy?

14          THE DEFENDANT:  I do, Your Honor.

15          THE COURT:  Do you understand that you may not have

16  any unsupervised contact with any minor, and that includes your

17  newborn child?

18          THE DEFENDANT:  I do, Your Honor.

19          THE COURT:  Ms. Eckenrode, would you administer an

20  oath, please, to Mr. Hollerich?

21          THE CLERK:  Yes.  That would follow also with his

22  signature on that, Your Honor.

23          THE COURT:  Yes.  Thank you.

24      (Administration of the oath.)

25          THE COURT:  All right.  Mr. Hollerich, it is necessary

1  for you to sign the amended order setting the conditions of

2  release.

3          Before I hand them to you, Ms. Lovejoy, if you were

4  here in our courtroom, I would require you to sign, agreeing to

5  serve as a third-party custodian.

6          May I sign your name to this document with your

7  permission?

8          MS. Lovejoy:  Yes.

9          THE COURT:  All right.  I will do so.  At this point,

10  I'm handing the amended conditions to Mr. Hollerich.  You can

11  feel free, if you'd like, to find a good place to sign them.  It

12  looks like Ms. Eckenrode is setting that up for you.

13          You can be seated.

14          All right.  With those conditions, I'm ordering that

15  Mr. Hollerich may continue his pretrial release under the

16  amended conditions that I've reviewed.

17          Before I forget about this, Mr. Brooks, Mr. Hollerich

18  needs to report to the marshal control center to be processed.

19  That needs to be done immediately after this proceeding.  I

20  believe they're in the building, although I can't tell you

21  exactly where.

22          THE CLERK:  Second floor.

23          THE COURT:  The second floor.  Please make sure that

24  that happens immediately after this proceeding here today.

25          Is there any other matter that counsel wanted to

1    address during this proceeding?  Ms. Gal-Or?

2              MS. GAL-OR:  Nothing from the government, Your Honor.

3              THE COURT:  Thank you for your efforts.  Mr. Brooks?

4              MR. BROOKS:  No, Your Honor.

5              THE COURT:  Thank you for your efforts as well.  I

6    appreciate everyone's attendance here today.

7              Ms. Masciantonio -- and someday I'll get it exactly

8    right, I promise -- I appreciate your input here today and your

9    appearance.

10             Ms. Lovejoy, we appreciate your appearance here today

11   and expect that you will abide with your duties as third-party

12   custodian, specifically to make sure that Mr. Hollerich neither

13   has any unsupervised time with your baby and does not access any

14   device in your home or otherwise have access to the Internet.

15   Do you understand?

16             MS. LOVEJOY:  Yes, I do, Your Honor.

17             THE COURT:  All right.  If there is nothing further,

18   that concludes this proceeding.

19             (Proceedings concluded at 11:24 a.m.)

20                              - - -

21                    C E R T I F I C A T E

22             I, SHARON SIATKOWSKI, certify that the foregoing is a
     correct transcript from the record of proceedings in the
23   above-entitled matter.

24   s/Sharon Siatkowski
     SHARON SIATKOWSKI, RMR, CRR, CBC, CRI
25   Official Court Reporter